# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

**FEDERAL TRADE COMMISSION,**

     Plaintiff,

v.

**THE ONLINE ENTREPRENEUR, INC.,**
a corporation, also d/b/a THE SIX FIGURE
PROGRAM and BEN AND DAVE'S
PROGRAM;

**BEN AND DAVE'S CONSULTING
ASSOCIATES, INC.,** a corporation;

**BENJAMIN MOSKEL,** individually and as
an officer or owner of THE ONLINE
ENTREPRENEUR, INC.; and BEN AND
DAVE'S CONSULTING ASSOCIATES,
INC.; and

**DAVID CLABEAUX,** individually and as
an officer or owner of THE ONLINE
ENTREPRENEUR, INC., and BEN AND
DAVE'S CONSULTING ASSOCIATES,
INC.,

     Defendants.

**Case No.**

8:12-CV-2500-T-27MAP

# PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF A RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## I.      INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") respectfully requests that the Court immediately halt a fraudulent scheme to market and sell a purportedly lucrative business opportunity that preys primarily on individuals who are unemployed.[1]  Defendants The Online Entrepreneur, Inc., also d/b/a The Six Figure Program and Ben and Dave's Program, Ben and Dave's Consulting Associates, Inc., and the companies' two principals, Benjamin Moskel and David Clabeaux, entice consumers nationwide to purchase their home-based Internet business opportunity chiefly through Internet advertising on their mirror-image websites sixfigureprogram.com and benanddavesprogram.com.

Since 2007, Defendants have deceptively advertised and sold the same work-at-home business opportunity under the name "The Six Figure Program" and more recently, under the name "Ben and Dave's Program" (hereafter collectively "the program").  The program purports to provide consumers with their own website and training that will enable consumers to make a significant income through Internet affiliate marketing.  Specifically, Defendants' websites represent that, for a fee of only $27.00, consumers can purchase a turn-key, money-back guaranteed business opportunity that will immediately allow consumers to begin to generate substantial sales commissions with no additional investment.

Contrary to Defendants' representations, consumers who purchase the program find

---

[1]  To support its Motion, Plaintiff submits 4 volumes of evidence and supporting exhibits consisting of: Vol. 1) Declaration of FTC Investigator; Vol. 2) Declarations of two BBB presidents; Vol. 3) Consumer Declarations; and Vol. 4) Recent *ex parte* TROs issued in this District and *ex parte* TROs issued in similar cases in the 11th Circuit and elsewhere.  Declarations are cited by their exhibit number (Plaintiff's Exhibit "PX. #") and, where appropriate, include citations to specific paragraphs ("¶") and pertinent attachments ("Att. [letter]").

that the program does not work as advertised.  After purchasing the program, consumers

discover that they must spend additional funds in excess of $100.00 in fees for domain

registration and webhosting in order get their websites up and running – fees that were not

disclosed to consumers before they purchased the program.  While many consumers choose

to end their participation with the program at this point, those consumers who spend these

additional funds in order to operate their websites rarely, if ever, earn commissions from

their websites and do not make the income promised.

Consumers' complaints and requests for refunds to Defendants typically go

unanswered.  Despite their advertised money-back guarantee, Defendants frequently fail to

provide consumer refunds, until and unless consumers file complaints with the Better

Business Bureau ("BBB").  However, even after filing a complaint with the BBB, not every

consumer receives a refund from Defendants.  Moreover, some consumers are unable to

recoup the additional funds they paid to third-party webhosting services.

The BBB has been monitoring Defendants' business practices since 2007.[2]  In the last

three years, over 60 consumer complaints have been filed with the BBB against Defendants,

48 of which have been filed within the last year.[3]  In the face of regulatory scrutiny,[4]

Defendants recently shut down one operation, The Six Figure Program, only to immediately

reopen operations offering the same scam under a new name, Ben and Dave's Program.

Defendants' egregious marketing practices violate Section 5(a) of the FTC Act, 15

[2] *See* Declaration of Warren Clark, President, BBB Serving Upstate New York (PX. 2); Declaration of Karen
Nalven, President, BBB of West Florida (PX. 3).

[3] PX. 2 ¶¶ 22, Att. A.

[4] PX. 2, Att. L (Review of The Online Entrepreneur by Advertising Self Regulatory Council's Electronic
Retailing Self-Regulation Program).

U.S.C. § 45(a)§§, which prohibits unfair or deceptive acts or practices in or affecting commerce, as well as the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" (the "Business Opportunity Rule"), 16 C.F.R. Part 437, as amended.  To immediately halt ongoing injury to consumers and preserve assets for potential redress to consumer victims, the FTC seeks an *ex parte* temporary restraining order ("TRO"), enjoining Defendants from continuing their deceptive sales practices and ordering ancillary equitable relief, including: an asset freeze; the appointment of a temporary receiver; immediate access to relevant business premises and records; and an order to show cause why a preliminary injunction should not issue.  These measures are necessary to prevent continued consumer injury, dissipation of assets, and destruction of evidence, thereby preserving this Court's ability to provide effective final relief to the victims of this deceptive scheme.[5]

## II.    THE PARTIES

### A.    Plaintiff Federal Trade Commission

The FTC is an independent agency of the United States created by statute.  15 U.S.C. §§ 41 *et seq*.  The FTC is charged, inter alia, with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, as well as enforcement of the Business Opportunity Rule, 16 C.F.R. Part 437, as amended.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act in order to secure such equitable relief as may

---

[5] *See* Certification and Declaration of Plaintiff's Counsel Barbara E. Bolton in Support of Plaintiff's *Ex Parte* Motions for an ex Parte Temporary Restraining Order and to Temporarily Seal File.

be appropriate in each case, and to obtain consumer redress.  15 U.S.C. §§ 53(b) and 57(b).

**B.     Defendants**

This case involves two Corporate Defendants that operate as a common enterprise,[6] and two Individual Defendants who control the two companies.

**1.     <u>The Corporate Defendants</u>**

**The Online Entrepreneur, Inc**. ("TOE"), incorporated in New York on March 20, 2007,[7] has offices at 200 High Point Road, Victor, New York 14428,[8] 2171 Monroe Ave., Rochester, New York 14618,[9] and at the private residence of one of its principals, David Clabeaux, in Land O' Lakes, Florida.[10]  Doing business as The Six Figure Program[11] and Ben and Dave's Program,[12] Defendant TOE offers for sale, sells, and promotes business opportunities to consumers nationwide through the websites <u>sixfigureprogram.com</u> and <u>benanddavesprogram.com</u>.[13]   TOE represents that it has had over 70,000 customers and gross annual sales of one to two million dollars.[14]

Defendant **Ben and Dave's Consulting Associates, Inc.**, was incorporated in New York on June 19, 2012,[15] and has offices at 2171 Monroe Avenue, Rochester, New York

---

[6] Section IV.B, below, provides a detailed discussion of common enterprise.

[7] Declaration of FTC Investigator Michael Liggins (PX. 1) ¶ 6.

[8] PX. 1 ¶¶ 6, 11.j, 21, 25, 39.b; PX. 2 ¶¶ 7, 10, 21, Atts. A-C, E, H, I; PX. 3 ¶ 16, Att. F.

[9] PX. 1 ¶ 11.d-g, 35.

[10] PX. 1 ¶¶ 9.h, 18, 27; PX 2 ¶¶ 7, 11, Atts. A-D, K, L; Declaration of Consumer Huffstetler (PX. 11) ¶ 4, Atts. A, E; Declaration of Consumer Sellman (PX. 17) ¶ 11, Att. G.

[11] PX. 1 ¶¶ 9, 11.h,18, 19.b, 20.b, 21.b, 27, 34, Atts. G-J, L, M, O, P, Z, KK; PX. 2 ¶¶ 7, 23, Att. A; PX. 3 ¶¶ 7, 11, Att. E.

[12] PX. 1 ¶¶ 20.b, 21.b, 24.a, 34, 39.a; PX. 2 ¶¶ 20-22, Att. A.

[13] *See generally* PX. 1 ¶¶ 23-24, Atts. HH-GG; PX. 2 - PX. 19.

[14] PX. 2 ¶ 10, Atts. B, H; PX. 3 ¶¶ 15-16, Atts. E-F.

[15] PX. 1 ¶ 7.

14618[16] and 8203 Main Street, Williamsville, New York 14221.[17] The company sells the business opportunity Ben and Dave's Program on its website, benanddavesconsulting.com.[18] TOE pays the rent on the Rochester and Williamsville, New York locations used by Ben and Dave's Consulting Associates.[19]  Ben and Dave's Consulting Associates has received money from TOE.[20]

### 2.    The Individual Defendants

Defendant **Benjamin Moskel** ("Moskell") is TOE's president, CEO, and co-owner.[21] Moskel is a signatory on TOE's bank accounts and has actively participated in the financial dealings of both Defendant Corporations,[22] in their operations,[23] as well as in the advertising and sales of the program.[24]  He is the incorporator, president, and CEO of Ben and Dave's Consulting Associates.[25]

Defendant **David Clabeaux** ("Clabeaux") has run the Florida-based operations of TOE out of his residence in Land O'Lakes, Florida.[26] Clabeaux is also the president of TOE and a co-owner of TOE and The Six Figure Program.[27] He is the primary signatory for the

---

[16] PX. 1 ¶ 17.

[17] PX. 1 ¶ 25, Att. II.

[18] PX. 1 ¶ 25, Att. II.

[19] PX. 1 ¶ 11.d-f, i.

[20] PX. 1 ¶ 11.l.

[21] PX. 1 ¶¶ 6.b, 11.a; PX. 2 ¶¶ 10, 17, Atts. A-B; PX. 3 ¶¶ 7, 16, Att. F.

[22] PX. 1 ¶¶ 11, 13, 17.

[23] PX. 1 ¶¶ 11, 19, 20.

[24] PX. 1 ¶¶ 19, 20, 23-25, 39.a, Atts. GG-II; PX 2-19.

[25] PX. 1 ¶¶ 17, 25.a, Att. C.

[26] PX. 1 ¶¶ 9.h, 18.a; PX. 2 ¶¶ 7, 11, Atts. A-D, K; PX. 3 ¶¶ 7, 13-15; PX. 11 ¶ 4, Atts. A, E; PX. 17 ¶ 11, Att. G.

[27] PX. 1 ¶¶ 11; PX. 2 ¶¶ 10, 17, Atts. B, H.

TOE bank accounts and has actively participated in the financial dealings of both Defendant Corporations,[28] in their operations,[29] as well as in the advertising and sales of the program.[30] Clabeaux is the Director of Business Operations for Ben and Dave's Consulting Associates.[31]

## III.    STATEMENT OF FACTS

### A.    Marketing of Defendants' Business Opportunity

Since 2007, Defendants have deceptively marketed a work-at-home, Internet marketing business opportunity by preying on consumers desperately searching the Internet for employment[32] or additional income from home.[33] Defendants advertised their business opportunity under the name "The Six Figure Program" chiefly via their website, sixfigureprogram.com.[34] Defendants also sent out email solicitations to consumers linking or directing the consumers to this website for further information about the program.[35]

In about late August 2012, however, Defendants ceased doing business under the name "The Six Figure Program" and morphed their business opportunity into an identical

---

[28] PX. 1 ¶¶ 11, 14.

[29] PX. 1 ¶¶ 11, 18, 21, 27.

[30] PX. 1 ¶¶ 18, 21, 23-25, 27, Atts. GG-II.

[31] PX. 1 ¶ 25, Att. II.

[32] Declaration of Consumer Blum (PX. 6) ¶ 2; Declaration of Consumer Dixon (PX. 10) ¶ 2; PX. 11 ¶ 2; Declaration of Consumer Joe (PX. 12) ¶ 2; Declaration of Consumer Mays (PX. 15) ¶ 2; Declaration of Consumer Ponafala (PX. 16) ¶ 2.

[33] Declaration of Consumer Aponte (PX. 4) ¶ 2; Declaration of Consumer Belanger (PX. 5) ¶ 2;  Declaration of Consumer Boyd (PX. 7) ¶¶ 2-3; Declaration of Consumer Carrillo-Torres (PX. 8) ¶ 3; PX. 10 ¶ 3; PX. 11 ¶ 3; PX. 12 ¶ 2; Declaration of Consumer Karr (PX. 13) ¶ 2; Declaration of Consumer Mallett(PX. 14) ¶ 2; PX. 15 ¶ 3; PX. 17 ¶ 2.

[34] PX. 4 ¶¶ 3, 10; PX. 5 ¶¶ 4, 13; PX. 7 ¶¶ 4, 16; PX. 8 ¶ 3; Declaration of Consumer Cohen (PX. 9) ¶ 4; PX. 10 ¶¶ 4, 7, 18; PX. 11 ¶¶ 3, 10; PX. 12 ¶ 4; PX. 13 ¶¶ 2, 8; PX. 14 ¶¶ 2, 15; PX. 15 ¶¶ 5, 21; PX. 16 ¶ 3; PX. 17 ¶¶ 3, 15; Declaration of Consumer Sheppard (PX. 18)  ¶¶ 3, 12; Declaration of Consumer Waldrop (PX. 19) ¶¶ 2, 12.

[35] PX. 9 ¶ 2; PX. 16 ¶ 2; PX. 18 ¶ 2.

new scheme, "Ben and Dave's Program," advertised on their new website

benanddavesprogram.com, a website virtually identical to sixfigureprogram.com.[36]

Defendants have also advertised Ben and Dave's Program on their other websites such as

benanddavesconsulting.com, myworkathomedvd.com, website-income.net, and

unimaxmedia.com.[37]

Through their websites, sixfigureprogram.com and benanddavesprogram.com,

Defendants have induced consumers to purchase The Six Figure Program, now Ben and

Dave's Program by representing that, for a fee of only $27.00,[38] consumers will get a

business opportunity that will allow them to earn a substantial income.[39] For example,

Defendants' websites, make the following claims:

> **Fact:** **Two Average Guys from Humble Beginnings Are Making 1.2 Million Per Year from Their Websites.**
> **Fact:** **Their Students Are Making Up to $15,000 Per Month from Their Home Computers.**
> **Fact:** **More Than Half of the Students Receive Their First Check Within 7 – 10 Days.**
>
> **Achieve 100% Financial and Personal Independence**
> The [] Program is not only a sure-fire money making system, it is a vehicle by which you can finally live the lifestyle you imagined for yourself.
>
> Some of our top students are making between $1,200 and $15,000 per month. They work from their laptops and their home computers.

---

[36] PX. 1 ¶ 24. In fact, when Investigator Liggins captured benanddavesprogram.com on 9/11/12, "Six Figure Program" instead of "Ben and Dave's Program" was still listed in various portions of the website.

[37] PX. 1 ¶¶ 25, 39.

[38] PX. 4 ¶¶ 3, 10; PX. 5 ¶¶ 4, 13; PX. 6 ¶¶ 4, 6, 16; PX. 7 ¶¶ 4, 16; PX. 8 ¶ 3; PX. 9 ¶ 4; PX. 10 ¶¶ 4, 7, 18; PX. 11 ¶¶ 3, 10; PX. 12 ¶ 4; PX. 13 ¶¶ 2, 8; PX. 14 ¶¶ 2, 14; PX. 15 ¶¶ 5, 21; PX. 16 ¶ 3; PX. 17 ¶¶ 3, 15; PX. 18 ¶¶ 3, 12; PX. 19 ¶¶ 2, 12.

[39] PX. 4 ¶¶ 3, 10; PX. 5 ¶¶ 2-3, 13; PX. 6 ¶¶ 2 -3, 16; PX. 7 ¶¶ 3-5, 16; PX. 9 ¶ 2; PX. 10 ¶¶ 3, 18; PX. 11 ¶¶ 3, 10; PX. 12 ¶ 3; PX. 13 ¶ 8; PX. 14 ¶¶ 2-3, 14; PX. 15 ¶¶ 4, 6, 21; PX. 16 ¶ 3; PX. 17 ¶¶ 3, 15; PX. 18 ¶¶ 3-5, 12; PX. 19 ¶¶ 2, 12.

Sit back and relax while you work from the comfort of your home computer!  Immediate Online Access!! No Monthly Membership!! Lifetime Access to Our Best Training Material Forever!! Start Making Money Today!! **ORDER NOW: $27.00** 90-Day Money-Back Guarantee

The typical person who joins and follows the simple steps laid out in the program has a check for at least $20 sent to their house within 7 - 10 business days. [*Emphasis in original*] [40]

The websites represent that for a $27.00 investment, Defendants will build

consumers a website[41] and provide training to consumers so that consumers can make

affiliate income[42] by being connected with the websites of "big companies" such as Prada:

**Here's how the program works: Big companies pay you money on the Internet. You post a link and you get paid when people using the Internet and your link buy things and sign up for services.**

The [] Program is a step-by-step guide which teaches you exactly how to set up your very own successful Internet business. The program includes our book - "The Online Entrepreneur" [], the Quick Start DVD, an audio coaching session with Ben and Dave, free customized professionally designed website, and everything you need to get started in order to cash your first commission check!

The possibilities are virtually limitless. You can make money from any company that does business over the internet. Some examples include: Prada, American Express, Citi Card, Bank of America, Esurance, Expedia, Prada, Juicy Couture, UGG Boots, Carnival Cruise Lines, more![43]

Defendants further represent that consumers will earn commission income every time

Internet users click through the consumers' websites and make purchases or sign up for

---

[40] PX.1 Atts. GG-II, LL.

[41] PX. 4 ¶¶3, 10; PX. 5 ¶¶ 4, 13; PX. 7 ¶¶ 4, 16; PX. 9 ¶ 4; PX. 10 ¶¶ 4, 7, 18; PX. 11 ¶¶ 3, 10; PX. 12 ¶ 4; PX. 13 ¶¶ 2, 8; PX. 14 ¶¶ 2, 14; PX. 15 ¶¶ 5, 21; PX. 16 ¶ 3; PX. 17 ¶¶ 3, 15; PX. 18 ¶¶ 3, 12; PX. 19 ¶¶ 2, 12

[42] PX. 4 ¶¶ 3-4; PX. 5 ¶ 4; PX. 6 ¶ 4;  PX. 7 ¶¶ 4, 16; PX. 9 ¶ 4; PX. 10 ¶ 5; PX. 11 ¶ 3; PX. 12 ¶ 4; PX. 15 ¶ 4; PX. 16 ¶ 4; PX. 17 ¶ 3; PX. 18 ¶ 4; PX. 19 ¶ 2.

[43] PX.1 Atts. GG-II, LL.

services from one of those retailers.[44] As an example, Defendants' websites claim that American Express is currently paying a $200 commission for a credit card referral and that "[i]f you make just one sale per day, you will earn $73,000.00 per year - and that's just from one single program."[45] Further, Defendants' websites are littered with examples of purported commission checks ranging from $2,500 for one week's work to a monthly commission check for $46,620.[46] These checks reinforce Defendants' claim of potentially limitless income to be gained from the program.[47]

Defendants also represent that the program is a turn-key home-based Internet business opportunity through which consumers can begin to make money immediately, stating for example:

> **"Once you receive the [] Program, you will literally be able to sit down at your computer and start making money.**
> **You'll receive your first check within 7-10 days!**

> The Six-Figure-Program [Ben and Dave's Program] shows you exactly what to do to immediately start making money. If you follow the instructions you can realistically receive your first commission check within about 7-10 days.[48]

In addition to claims that consumers' websites will generate quick and potentially substantial income, Defendants make other promises to induce consumers to purchase their program, including that the purchase is "risk free" and backed by a 90 day money-back guarantee.[49]

---

[44] PX. 7 ¶ 4; PX. 8 ¶ 3.
[45] PX.1 Atts. GG-II.
[46] *Id.*
[47] PX. 6 ¶ 4; PX. 7 ¶ 5; PX. 12 ¶ 3.
[48] PX.1 Atts. GG-II.
[49] PX. 6 ¶ 4; PX. 9 ¶ 4; PX. 10 ¶ 4; PX. 15 ¶ 5; PX. 17 ¶ 3.

9

**90 Day, 100% Money-Back Guarantee**
If you are unsatisfied with the Six Figure Program [Ben and Dave's program] for
ANY reason, if you feel the 42+ training videos, the published book The Online
Entrepreneur, and the website we build for you are not worth MORE than the one-
time investment of $27.00 you paid, simply shoot us an email at
support@sixfigureprogram.com [support@benanddavesprogram.com] within 90 days
(that's 3 full months!!) and we'll refund your money, no questions asked.

Plus, the Six Figure Program [Ben and Dave's Program] is a true no-risk, high reward
method. There are no business start up fees, investment capital or infrastructure
involved![50]
[*Emphasis in original*]

## B.     Consumers' Experience Defendants' Deception

Having been induced to buy the program through the websites' claims of quick and

certain income, consumers typically purchase the program by putting their credit[51] or debit

card[52] information into the website, although they can also call the toll-free number listed on

the websites.[53]  Soon thereafter, consumers receive a purchase confirmation/welcome-to-the-

program email from Moskel and Clabeaux that contains a link to access the video training.[54]

Once consumers click on the email link and begin to view the program training

videos, they quickly discover that they can only use their new website once they have spent

additional funds to purchase a domain name and hosting services for their website.[55]

Defendants direct consumers to the website of a specific web service provider,[56] where

---

[50] PX.1 Atts. GG-II.

[51] PX. 6 ¶¶ 5, 12; PX. 7 ¶ 6; PX. 9 ¶ 5; PX. 12 ¶ 5; PX. 16 ¶ 5; PX. 19  ¶ 4

[52] PX. 4 ¶ 4; PX. 10 ¶ 5; PX. 11 ¶ 4; PX. 15 ¶ 7; PX. 17 ¶ 4

[53] PX. 1 ¶¶ 29-31.

[54]  PX. 4 ¶ 4; PX. 6 ¶ 6; PX. 7 ¶ 6; PX. 10 ¶ 6; PX. 11 ¶ 4; PX. 14 ¶ 3; PX. 15 ¶ 7; PX. 16 ¶ 5; PX. 17 ¶ 4; PX.
18  ¶ 6; PX. 19 ¶ 5.

[55] PX. 4 ¶ 4; PX. 5 ¶ 5; PX. 6 ¶¶ 6, 10; PX. 7 ¶ 7; PX. 8 ¶4; PX. 10 ¶¶ 7- 8, 18; PX. 11 ¶ 4; PX. 12 ¶ 5; PX. 13 ¶
4; PX. 14 ¶¶ 4,  6; PX. 15 ¶ 9; PX. 16 ¶ 6; PX. 17 ¶ 5; PX. 18 ¶ 7; PX. 19 ¶ 6

[56] PX. 4 ¶ 4; PX. 5 ¶ 5; PX. 11 ¶ 4; PX. 14 ¶ 5; PX. 15 ¶ 9; PX. 16 ¶ 6; PX. 18 ¶ 7; PX. 19  ¶ 6 (Hostgator); PX.
5 ¶ 5; PX. 7 ¶ 7; PX. 8 ¶ 4; PX. 12 ¶ 5; PX. 13 ¶ 4; PX. 17 ¶ 5 (BrainHost); PX. 6 ¶ 6 (Smart Puppy Hosting).
Both BrainHost and Smart Puppy Hosting have paid Defendants considerable money. *See* PX. 1 ¶¶ 15-16.

consumers find out that these additional domain registration and webhosting services will cost in excess of $100, over what they have already paid to Defendants.[57]

Realizing that the total cost of the program had been misrepresented to them,[58] some consumers decide that they will not pursue the program further and attempt to contact Defendants to request a refund.[59]  Other consumers, however, decide to pay the additional fees in hopes of making the promised substantial income.[60]  Consumers who decide to pay these additional costs, often encounter problems getting access to their promised websites[61] and/or getting their websites to function.[62]  Consumers also have difficulty reaching Defendants to obtain assistance through either voicemail[63] or email.[64]  Few consumers who pay the addition web service costs and who doggedly work at  Defendants' business opportunity ultimately derive any income from their websites.[65]

Consumers continually find that they cannot reach Defendants to cancel the program and get their promised refund.[66]  After repeated attempts, consumers are left with no

---

[57] PX. 4 ¶¶ 4, 10; PX. 5 ¶ 5; PX. 6 ¶¶6-7; PX. 7 ¶ 7; PX. 10 ¶¶ 7-8, 18; PX. 11 ¶¶ 4, 10; PX. 12 ¶ 5; PX. 13 ¶ 8; PX. 14 ¶¶ 2, 14; PX. 15 ¶ 9; PX. 16 ¶ 6; PX. 17 ¶ 5; PX. 18 ¶ 5; PX. 19 ¶ 6.

[58] PX. 6 ¶ 7; PX. 7 ¶ 16; PX. 10 ¶¶ 7, 18; PX. 18 ¶ 10; PX. 19 ¶ 12.

[59] PX. 6 ¶ 8; PX. 10 ¶ 8; PX. 17 ¶¶ 5-6.

[60] PX. 4 ¶ 4; PX. 5 ¶ 5; PX. 7 ¶ 7; PX. 8 ¶7; PX. 11 ¶ 5; PX. 12 ¶ 5; PX. 14 ¶ 5; PX. 15 ¶ 10; PX. 16 ¶ 6; PX. 18 ¶ 7; PX. 19 ¶ 7.

[61] PX. 4 ¶ 5; PX. 5 ¶ 6; PX. 7 ¶ 8; PX. 11  ¶ 5; PX. 12 ¶ 7; PX. 14 ¶ 14; PX. 15 ¶¶ 11, 15, 21; PX. 16 ¶ 7; PX. 19 ¶¶ 7, 9.

[62] PX. 5 ¶ 6; PX. 13 ¶ 8; PX. 14 ¶ 14; PX. 15 ¶¶ 11, 15, 21.

[63] PX. 4 ¶ 5; PX. 5 ¶ 6; PX. 7 ¶¶ 9-12; PX. 8 ¶ 6; PX. 11 ¶¶ 7- 8; PX. 12 ¶¶ 8-9; PX. 14 ¶¶ 7- 8, 10; PX. 15 ¶¶ 11- 13; PX. 16 ¶¶ 7-8; PX. 17 ¶ 8; PX. 19  ¶¶ 7-8.

[64] PX. 4 ¶ 5; PX. 5 ¶ 6; PX. 7 ¶¶ 9-12; PX. 11 ¶¶ 7- 8; PX. 12 ¶¶ 8-9; PX. 14 ¶¶ 7- 8, 10; PX. 15 ¶¶ 11- 13; PX. 16 ¶¶ 7-8; PX. 17 ¶ 8; PX. 19  ¶¶ 7-8

[65] PX. 5 ¶ 6; PX. 13 ¶ 8; PX. 14 ¶ 14; PX. 15 ¶¶ 11, 15, 21

[66] PX. 4 ¶ 6; PX. 6 ¶ 11; PX. 7 ¶ 12; PX. 10 ¶ 8; PX. 13 ¶ 4; PX. 12 ¶ 9; PX. 14 ¶ 9; PX. 15 ¶ 14; PX. 17 ¶ 6; PX. 18  ¶ 11.

alternative but to file complaints against Defendants with the Better Business Bureau ("BBB").[67] Most, but not all, consumers who seek assistance through the BBB ultimately receive a refund from Defendants.[68] Further, some consumers lose the money they invested in additional costs related to the website,[69] and any supplemental coaching and marketing materials purchased, which can run from hundreds of dollars upward to several thousand dollars.[70]

## C. Defendants' Misrepresentations

### 1. Misleading or False Representations Regarding Potential Income

Defendants misled or falsely represented that their business opportunity would provide consumers with substantial income. As described above, Defendants' website advertising represents to consumers that they can make substantial earnings by purchasing the program, but these representations are untrue. Consumers who purchased the program in the belief that they would receive commission income from affiliate marketing traffic to their websites report that they did not obtain the promised income. Even those consumers who stuck with the program – despite paying the additional fees required to obtain their websites and having great difficulty obtaining assistance from Defendants to operate their websites – generally failed to receive any, let alone substantial, income from the program.

---

[67] PX. 4 ¶ 7; PX. 5 ¶ 7; PX. 7 ¶ 13; PX. 8 ¶ 8; PX. 9 ¶ 7; PX. 10 ¶ 14; PX. 11 ¶ 9; PX. 12 ¶ 12; PX. 13 ¶ 5; PX. 14 ¶ 11; PX. 15 ¶ 15; PX. 16 ¶ 10; PX. 17 ¶ 9; PX. 19 ¶ 11.

[68] PX. 4 ¶ 10; PX. 8 ¶ 7; PX. 10 ¶ 18;

[69] PX. 4 ¶ 4; PX. 7 ¶ 15; PX. 15 ¶ 17; PX. 11 ¶ 10

[70] PX. 4 ¶ 10 ($1,027); PX. 5 ¶ 13 ($227); PX. 6 ¶5 (41); PX. 7 ¶14 ($181.75); PX. 10 ¶15 ($27); PX. 11 ¶ 10 ($130); PX. 12 ¶ 10 ($827); PX. 14 ¶¶ 3-5($354); PX. 15 ¶ 17 ($104.55); PX. 18 ¶¶ 6-7 ($109); PX. 19 ¶ 12 ($89.55)

12

### 2.    Misrepresentation of Program Costs

Defendants' websites claim for a fee of $27.00, "The Six Figure Program [or Ben and Dave's Program] is a **step-by-step guide** which teaches you exactly how to set up your very own successful Internet business. The program includes . . . everything you need to get started in order to cash your first commission check!" Here too, the representation is untrue. Consumers are required to spend considerable money, beyond their $27.00 investment, to purchase a domain name and monthly webhosting for their website. In fact, consumers are required to spend more than $100 extra on these website services.

### D.    Defendants' Law Violations

### 1.    Defendants Violate Section 5 of the FTC Act (Counts I & II)

Defendants violated Section 5 of the FTC Act by misrepresenting the income to be earned through the program and its cost. An act or practice is deceptive under Section 5(a) if it involves a representation or omission that is material and would likely mislead consumers acting reasonably under the circumstances. A "material" misrepresentation or omission is one that involves information that is important to consumers and, as such, is likely to affect their choice of, or conduct regarding, a product or service.[71] Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service, such as the claims made here, are presumed to be material.[72] Courts consider the overall net

---

[71] *See FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 960 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008).

[72] *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999); *FTC v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995).

impression created by the acts or practices when evaluating their deceptiveness.[73]

2.    **Defendants Violate The Business Opportunity Rule (Counts III - V)**

In offering for sale and selling their business opportunity, Defendants have also violated multiple provisions of the Business Opportunity Rule.  Defendants are subject to the Business Opportunity Rule, because they advertise and sell to consumers a business opportunity consisting of a website – an Internet outlet under Rule Section 437.1©) – through which consumers can purportedly earn income while working from home.

The evidence demonstrates that Defendants have violated the Business Opportunity Rule, which requires that business opportunity sellers provide consumers specific information in order to allow consumers to fairly evaluate the business opportunity being offered.  16 C.F.R. § 437.1.  First, the Business Opportunity Rule requires that business opportunity sellers provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments (16 C.F.R. § 437.3(a)(1)-(5)) at least seven days before the prospective purchaser signs a contract or makes a payment.  16 C.F.R. § 437.2.  Defendants have failed to provide consumers with this required disclosure document at any time.[74]

The Business Opportunity Rule also prohibits sellers from making earnings claims unless the seller furnishes to prospective purchasers an "Earnings Claim" statement in conjunction with the Business Opportunity Rule disclosure document. 16 C.F.R. § 437.2.  In

---

[73] *FTC v. Peoples Credit First*, No. 8:03-cv-2353, 2005 U.S. Dist. LEXIS 38545, *20-25 (M.D. Fla. Dec. 18, 2005), *aff'd*, 244 Fed. Appx. 942 (11th Cir. July 19, 2007); *FTC v. Tashman*, 318 F.3d at 1283; *FTC v. Atlantex Assocs.*, No. 87-0045-CIV-Nesbitt, 1987 U.S. Dist LEXIS 10911, *29 (S.D. Fla. Nov. 25, 1987).

[74] PX. 1 ¶ 38;  PX. 4 ¶ 8; PX. 5 ¶ 11; PX. 6 ¶ 13; PX. 8 ¶ 9; PX. 9 ¶ 9; PX. 10 ¶ 16; PX. 12 ¶ 14; PX. 13 ¶ 6; PX. 14 ¶ 12; PX. 15 ¶ 19; PX. 16 ¶ 13; PX. 17 ¶ 12

this instance, Defendants have made earnings claims concerning their business opportunity through advertising media, namely, their websites sixfigureprogram.com and benanddavesprogram.com, but have failed to provide the required "Earnings Claim" statements to prospective purchasers.[75]

Finally, the Business Opportunity Rule imposes separate, additional requirements on sellers making earnings claims in the "general media."[76] Sellers are prohibited from making claims in the general media unless the seller: (1) has a reasonable basis for the claim and has in its possession written materials to substantiate the claim at the time it is made; and (2) states in immediate conjunction with the claim the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased sellers' business opportunity prior to that ending date who achieved at least the stated level of earnings.  16 C.F.R. § 437.4(b).  Here, Defendants have made earnings claims in the general media, *i.e.*, on their websites sixfigureprogram.com and benanddavesprogram.com, but have failed to state the required earnings disclosures in immediate conjunction with those general media earnings claims.[77]

## IV.   THE COURT IS AUTHORIZED TO GRANT THE RELIEF REQUESTED

Section 13(b) of the FTC Act authorizes the FTC to bring suit in federal district court whenever it has reason to believe that a party is violating, or is about to violate, "any

---

[75] PX. 1 ¶ 38; PX. 4 ¶ 9; PX. 5 ¶ 12; PX. 6 ¶ 14; PX. 8 ¶10; PX. 9 ¶ 10; PX. 10 ¶ 17; PX. 12 ¶ 15; PX. 13 ¶ 7; PX. 14 ¶ 13; PX. 15 ¶ 20; PX. 16 ¶ 14; PX. 17 ¶ 13
[76] Under the Rule, the "general media" means "any instrumentality through which a person may communicate with the public including, but not limited to, television, radio, print, Internet, billboard, Website, commercial bulk email, and mobile communications." 16 C.F.R. §437.1(h).
[77] PX.1 Atts. GG-II.

provision of the law enforced by the [FTC]," including Section 5(a) of the FTC Act.[78]  The

second proviso of Section 13(b), under which this action is brought, provides that "in proper

cases the FTC may seek and, after proper proof, the court may issue a permanent

injunction."[79]  It is this proviso that gives the FTC authority to bring a permanent injunction

action in District Court.

The unqualified grant of statutory authority to issue an injunction pursuant to the

second proviso of Section 13(b) also empowers this Court to grant the full range equitable

remedies sought by the FTC.[80]  Section 13(b) of the FTC Act authorizes this Court to grant

preliminary and permanent injunctions to enjoin violations of any law enforced by the

Commission:[81]

> . . . Congress, when it gave the district court authority to grant
> a permanent injunction against violations of any provisions of
> law enforced by the Commission, also gave the district court
> authority to grant any ancillary relief necessary to accomplish
> complete justice because it did not limit that traditional
> equitable power explicitly or by necessary and inescapable
> inference.[82]

Thus, the Court has authority under Section 13(b) to order ancillary equitable

remedies as well as any additional temporary or preliminary relief necessary to preserve the

---

[78]  15 U.S.C. § 53(b).

[79]  *Id.*

[80]  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-70 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir. 1984); *see also FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989) (in a proceeding under Section 13(b), district court has "power to order any ancillary equitable relief necessary to effectuate" its grant of authority), *cert. denied*, 493 U.S. 954 (1989).

[81]  *Gem Merch.*, 87 F.3d at 468-470; *U.S. Oil & Gas*, 748 F.2d at 1432-34 (quoting *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-1112 (9th Cir. 1982)); *see also FTC v. U.S. Mortg. Funding, Inc.*, No. 11-cv-80155, 2011 U.S. Dist. LEXIS 31148, *5-6 (S.D. Fla. Mar. 1, 2011).

[82]  *U.S. Oil & Gas*, 748 F.2d at 1434 (quoting *H. N. Singer*, 668 F. 2d at 1113); *see also Gem Merch.*, 87 F. 3d at 469; *Amy Travel*, 875 F.2d at 571-72; *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718-19 (5th Cir. 1982).

possibility of effective final relief.[83] Courts in this District and throughout the Eleventh

Circuit have granted the full range of preliminary relief in actions brought under Section

13(b), including temporary restraining orders entered without notice.[84]

A second basis to provide preliminary relief is Section 19 of the FTC Act, 15 U.S.C.

§ 57b. Section 19 grants the Court jurisdiction to order relief necessary to redress injury to

consumers from Defendants' violations of the TSR. 15 U.S.C. § 57b(a)(1)(b). The court's

authority to grant equitable relief under Section 19 of the FTC Act, 15 U.S.C. § 57b, includes

the authority to grant preliminary injunctive relief.[85]

### A.    Entry of a Temporary Restraining Order and Preliminary Injunction is Appropriate

In the 11th Circuit, courts consider two factors in determining whether to grant

preliminary injunctive relief under Section 13(b):  (1) the likelihood of success on the merits;

and (2) the balance of equities.[86]  Irreparable injury need not be shown.[87]  Also, harm to the

---

[83]  *See Gem Merch.*, 87 F.3d at 469 ("a district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible").

[84]  *See, e.g., FTC v. Nat'l Solutions, LLC*, Case No. 6:11-cv-1131-22GJK (M.D. Fla. July 11, 2011) (similar facts as the instant matter); *FTC v. Vacation Property Services, Inc.*, Case No. 8:11-cv-00595JDW-MAP (M.D. Fla. Mar. 23, 2011) (similar facts as the instant matter); *FTC v. JPM Accelerated Servs. Inc.*,No. 6:09-cv-2021-ORL-28-KRS (M.D. Fla. Nov. 30, 2009); *FTC v. Washington Data Resources, Inc.*, No. 8:09-cv-02309-SDM-TBM (M.D. Fla. Nov. 13, 2009); *FTC v. Global Mktg.*, 594 F.Supp.2d 1281 (M.D. Fla. 2009); and other orders attached as Exhibits 42-56.

[85]  *FTC v. Career Info. Servs., Inc.*, No. 1:96-cv-1464, 1996 U.S. Dist. LEXIS 21207, at *10 (N.D. Ga. June 21, 1996) (citing *Singer*, 668 F.2d at 1110-12).

[86]  *See FTC v. USA Beverages, Inc.*, No. 05–61682, 2005 U.S. Dist. LEXIS 39075, *14-15 (S.D. Fla. Dec. 5, 2005); *FTC v. Para-Link Int'l, Inc.*, No.  8:00-cv-2114-T-17TBM, 2001 U.S. Dist. LEXIS 17372, *14 (M.D. Fla.  Feb.  28, 2001).

[87]  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *see also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984).

public interest is presumed in a statutory enforcement action.[88]  Moreover, in demonstrating

its "likelihood of success," the FTC is not required to show a strong probability of success,

although the evidence presented in this matter does make such a showing.  Rather, because

irreparable injury is presumed in a statutory enforcement action, the FTC need only show

that it has "some chance of probable success on the merits."[89]

### 1.       Plaintiff is Likely to Succeed on the Merits

The evidence filed in support of Plaintiff's motion demonstrates a substantial

likelihood that Plaintiff will succeed in establishing that the Defendants are violating Section

5 of the FTC Act and the Business Opportunity Rule.  Since 2007 and continuing to this day,

Defendants have misled and injured consumers through an ongoing, widespread, and

pervasive pattern of deception in the marketing and sale of their work-at-home business

opportunities, The Six Figure Program and Ben and Dave's Program.[90]

### 2.       The Balance of Equities Decidedly Favors Injunctive Relief

The balance of equities mandates injunctive relief in this case.  Where, as here,

public and private equities are at issue, public equities far outweigh private equities.[91]  This

---

[88]  *FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 346 (9th Cir. 1989); *see also USA Beverages*, U.S. Dist LEXIS 39075 at \*15; *FTC v. Home Assure, LLC*, No. 8:09-cv-547–T-23TBM, 2009 U.S. Dist. LEXIS 32053, \*4 n.4 (M.D. Fla. Apr. 16, 2009); *FTC v. Warner Commc'ns, Inc.*, 742 F. 2d 1156, 1165 (9th Cir. 1984) ("when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight").
[89]  *USA Beverages*, U.S. Dist LEXIS 39075 at \*15; *Home Assure*, 2009 U.S. Dist. LEXIS 32053 at \*17; *World Wide Factors*, 882 F.2d at 346-347.
[90]  *See* Section III, above.
[91]  *World Wide Factors*, 882 F.2d at 347; *USA Beverages*, 2005 U.S. Dist. LEXIS 39075 at \*14-15; *see Univ. Health*, 938 F.2d at 1225 (" ... we must afford [private equities] little weight, lest we undermine section 13(b)'s purpose of protecting the 'public-at-large'"), *Gem Merch.*, 87 F.3d at 469 ("since the public interest is involved ... those [inherent] equitable powers [of the District Court] assume an even broader and more flexible character than when only a private controversy is at stake").

is particularly true in the instant case because the Defendants "can have no vested interest in a business activity found to be illegal."[92] Further, the need for injunctive relief is especially acute where it may prevent significant injury, as is true in this case.[93]

Here, the public equities in this case are compelling because the public has a strong interest in immediately halting a deceptive scheme that has injured thousand of consumers, and in preserving the assets necessary to provide effective final relief to victims. Defendants, by contrast, have no legitimate interest in continuing to violate the law by operating a business permeated with deceptive and abusive acts and practices.[94]

An immediate injunction also serves the public interest because the relief addressing the Defendants' law violations simply requires Defendants to obey the law. On balance, requiring Defendants to comply with the law is not an unreasonable burden.

Immediate injunctive relief is also warranted to prevent further substantial injury to the public. Defendants' past conduct indicates a reasonable likelihood of future violations of the FTC Act.[95] Defendants have systematically deceived consumers for many years with a business opportunity sold through misrepresentations and outright lies to consumers. Defendants' scheme continues unabated despite five years of complaints and clear notice of their deceptive acts.[96]

---

[92] *U.S. v. Diapulse Corp. of Am.*, 457 F 2d 25, 29 (2d Cir. 1972).
[93] *World Travel Vacation Brokers*, 861 F.2d at 1030-1031.
[94] *See Para-Link Int'l*, 2000 U.S. Dist. LEXIS 21509 at *14-15.
[95] *USA Beverages*, 2005 U.S. Dist. LEXIS at *22; *see also SEC v. R. J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("Once a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations").
[96] In addition to forwarding consumer complaints to Defendants since 2007, the BBB has repeatedly notified Defendants through letters and a report issued by National Advertising Review Council (NARC) regarding the questionable earnings claims in their websites and failure to disclose the total costs of the program.  PX. 2 ¶ 23, Att. L; PX. 3.

19

When enacting Section 13(b), Congress intended to serve the public interest by protecting victims from the effects of deceptive trade practices "as quickly as possible."[97] By temporarily and preliminarily enjoining Defendants' illegal practices, this Court will effectuate Congress' intent in enacting Section 13(b).

### B.   COMMON ENTERPRISE

"Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others."[98] In this case, the Corporate Defendants have ignored their corporate form and have operated as a Common Enterprise thereby subjecting themselves to being held jointly and severally liable for this business opportunity scheme.[99] As this Court has noted, "[a] common enterprise operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."[100] Here, the Corporate Defendants coordinated activities have all the indicia of a common enterprise.

First, as noted in detail in Section II. B, the Corporate Defendants share the same principals, Ben Moskel and Dave Clabeaux, who control their operations. Moskel and Clabeaux also control the single primary corporate bank account for the companies, which is

---

[97] *World Travel Vacation Brokers*, 861 F.2d at 1028; *see also Southwest Sunsites*, 665 F.2d at 718-19.
[98] *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *rev'd in part on other grounds*, 312 F.3d 259 (7th Cir. 2002).
[99] *See FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV., 2004 WL 5149998, at *42 (S.D. Fla. Feb. 20, 2004) ("When two or more corporations act as a common enterprise, equity demands that they be held jointly and severally liable for their equitable misconduct.")
[100] *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012).

used to pay business expenses for the Defendants Corporations.[101]  The companies also share offices,[102] telephone numbers[103] and website-related costs.[104]  Further the Corporate Defendants share advertising and marketing through a myriad of websites.[105]  Accordingly, the Corporate Defendants are operating a common enterprise.

## C.    Individual Defendants Moskel and Clabeaux are Liable for Injunctive and Monetary Relief

An individual is liable for a corporation's violations of Section 5(a) of the FTC Act when: (1) the corporate defendant violates the FTC Act; (2) the individual defendant either has authority to control the corporate defendant or participates directly in the wrongful acts or practices; and (3) the individual defendant has some knowledge of the wrongful acts or practices.[106]  Defendants Ben Moskel and Dave Clabeaux are individually liable under this standard because each has authority to control the Corporate Defendants, knowledge of the wrongdoing, and each has participated directly in the wrongful acts and practices.

Both men have drawn a substantial amount of money from the proceeds of the fraud.[107]  Via the companies websites, and packaging for the program, both are also are on

---

[101] PX 1. ¶ 11.

[102] 2171 Monroe Avenue, Rochester, NY (*see* II.B., above).

[103] PX. 1 ¶¶ 19, 20, 21, 39.

[104] PX. 1 ¶¶ 18, 21, 27, 39.

[105] PX. 1 ¶¶ 18, 25, 27, 39.

[106] *FTC v. USA Fin., LLC*, 2011 U.S. App. LEXIS 3774 at *9 (citing *Gem Merch.*, 87 F.3d at 470); *see also FTC v. Windward Mktg. Ltd.*, No. 1:96-cv-615-FMH, 1997 U.S. Dist. LEXIS 17114, *38 (N.D. Ga. Sept. 30, 1997).  Proof of intent to defraud is not required to satisfy the knowledge requirement. *FTC v. Jordan Ashley*, No. 93-2257, 1994 U.S. Dist. LEXIS 7494, *11 (S.D. Fla. Apr. 5, 1994) (citing *Amy Travel*, 875 F.2d at 573-74).  Nor must the Commission demonstrate that defendants had actual knowledge of the misrepresentations – reckless indifference to the truth or falsity of the representations or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth will suffice. *Atlantex Assoc.*, 1987 U.S. Dist. LEXIS 10911 at *25-26; *see also FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005); *Amy Travel*, 875 F.2d at 574. Authority to control a corporation is presumed when an individual is a corporate officer of a small, closely held corporation. *See Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114 at *38; *Amy Travel*, 875 F.2d at 573.

[107] PX. 1. ¶¶ 13, 14.

display to the world as the controlling principals behind TOE's program and Ben and Dave's Consulting Associates.[108]  As an officer and owner of the Corporate Defendants,[109] Ben Moskel has authority to control, and actively participates in the operations including controlling the bank accounts and the financial dealings of both Defendant Corporations,[110] their operations,[111] and their advertising and sales of the program.[112]  Moskel is also the domain registrant for sixfigureprogram.com, one of the websites where misleading claims have been made.[113]

Clabeaux also has authority to control, and actively participates in, the Corporate Defendants' operations.  The Florida-based operations of TOE are run out of his personal residence.[114]  Clabeaux is also the president and co-owner of TOE,[115] as well as the Director of Business Operations for Ben and Dave's Consulting Associates.[116]  He too is a signatory for the TOE bank accounts.[117]  Like Moskel, Clabeaux actively participates in the financial dealings of both Defendant Corporations,[118] in their operations,[119] as well as in the advertising and sales of the program.[120]

Both Moskel and Clabeaux have the requisite knowledge of the corporate

---

[108] PX.1 ¶¶ 23-25, 28, 35-37.
[109] PX. 1 ¶¶ 6.b, 11.a, 17, 25.a, Att. C.; PX. 2 ¶¶ 10, 17, Atts. A-B; PX. 3 ¶¶ 7, 16, Att. F.
[110] PX. 1 ¶¶ 11, 13, 17.
[111] PX. 1 ¶¶ 11, 19, 20.
[112] PX. 1 ¶¶ 19, 20, 23-25, 39.a, Atts. GG-II; PX 2-19.
[113] PX. 3 ¶ 10.
[114] PX. 1 ¶¶ 9.h, 18.a; PX. 2 ¶¶ 7, 11, Atts. A-D, K; PX. 3 ¶¶ 7, 13-15; PX. 11 ¶ 4, Atts. A, E; PX. 17 ¶ 11, Att. G.
[115] PX. 1 ¶¶ 11; PX. 2 ¶¶ 10, 17, Atts. B, H.
[116] PX. 1 ¶ 25, Att. II.
[117] PX. 1 ¶¶ 11, 14.
[118] PX. 1 ¶¶ 11, 14.
[119] PX. 1 ¶¶ 11, 18, 21, 27.
[120] PX. 1 ¶¶ 18, 21, 23-25, 27, Atts. GG-II.

Defendant's wrongful acts.   As the two officers and owners of the Corporate Defendants, they control every aspect of the companies business operations.   Since at least 2007, the Individual Defendants have been sent a continuous stream of consumer complaints from the BBB and both have responded to these complaints.[121]  Further, despite their recent participationin a review of the program buy the National Advertising Review Council and Council of Better Business Bureaus to modify their advertising practices, the BBB continues to receive the same types of consumer complaints.[122]

**C.    An Asset Freeze, Immediate Access and a Temporary Receiver Should be Ordered**

Plaintiffs seek to redress injury for consumers as a part of the final relief in this case. To ensure the possibility of such relief, the proposed temporary restraining order is designed to preserve the *status quo* pending a hearing on preliminary injunctive relief.  Consistent with orders issued in other Section 13(b) actions, the temporary restraining order would: (1) require Defendants to immediately cease their deceptive and abusive sales practices; (2) freeze Defendants' assets; (3) appoint a temporary receiver over the corporate Defendants; and (4) permit the temporary receiver and Plaintiffs immediate access to the corporate Defendants' business premises and records.

Asset freezes are a proper equitable remedy to assure the availability of permanent relief.[123]  The power of a district court to issue an asset freeze in a §13(b) action is well

---

[121] PX. 2, PX. 3.
[122] PX. 2 ¶ 23, Att. L.
[123] *See Gem Merch.*, 87 F.3d at 469; *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F. 3d 982, 987 (11th Cir. 1995); *U.S. Oil & Gas*, 748 F.2d at 1433-34; *see also U.S. Mortg. Funding*, 2011 U.S. Dist LEXIS at *18; *see also* orders attached as Exhibit 40.

established.[124]  A freeze of assets of the individuals and the corporations is essential to

prevent the dissipation of assets during the pendency of litigation.[125]

   In this case, the business practices are permeated with deceit, false promises, and

misrepresentations.  The Defendants continued their unlawful conduct even after being

shown time and again by consumers and the BBB alike the clear evidence of their deception.

There is a strong likelihood that assets will be dissipated or concealed during legal

proceedings, causing irreparable injury to the FTC's ability to obtain relief for consumers.

Courts have ordered assets frozen on the basis of pervasive deceptive activities.[126]  In

addition to freezing corporate assets, courts have frozen individual defendants' assets where

the individuals controlled the deceptive activity and had actual or constructive knowledge of

the deceptive nature of the practices in which they were engaged.[127]  Defendants' pervasive

and ongoing deception demonstrates their willingness to engage in wrongdoing.  The

possibility of a large monetary judgment depriving Defendants of the fruits of their illicit

labor provides Defendants with ample incentive to conceal or dissipate otherwise

recoverable assets.[128]  A freeze of Defendants' assets is essential to prevent their dissipation.

   As another measure to maintain the *status quo*, Plaintiffs seek appointment of a

temporary receiver who will locate and preserve assets and records of the corporate

---

[124] *Gem Merch.*, 87 F.3d at 468-469.

[125] *U.S. Mortg. Funding*, 2011 U.S. Dist. LEXIS 31148 at *17-18 (court issued asset freeze as "necessary to insure [sic] existing assets are not dissipated"); *see also H. N. Singer*, 668 F.2d at 1112-1113 (asset freeze appropriate to preserve possibility of restitution).

[126] *See also* orders attached as Exhibits 40-56.

[127] *Amy Travel*, 875 F.2d at 574-76; *World Travel Vacation Brokers*, 861 F.2d at 1022-24, 1031; *cf. Wilcox*, 926 F. Supp. at 1104.

[128] *See* Rule 65(b) Declaration of Counsel accompanying Plaintiffs' Motion.

Defendants to obviate the threat of destruction, dissipation, or secretion.[129]  A temporary

receiver is necessary because, as shown above, the business of Defendants is permeated by

trickery and deceit.[130]  Furthermore, computer records and assets can be destroyed or

concealed, unless a third party has possession of the business.

During the pendency of the temporary restraining order, a temporary receiver will be

in a position to prevent further telemarketing abuses and ensure that injured consumers will

not continue to be unlawfully charged.  The temporary receiver will also help identify

injured consumers and examine the scope of consumer injury caused by the Defendants.

The proposed temporary restraining order also grants the temporary receiver and

Plaintiff immediate access to the business premises of the corporate Defendants for the

purpose of locating, copying, and preserving evidence.  Immediate access is needed to

protect evidence against destruction and ensure that the Court can ultimately determine: (1)

the scope of Defendants' law violations; (2) the identities of injured consumers; (3) the total

amount of consumer injury; and (4) the nature, extent, and location of Defendants' assets.

### D.      The Proposed Temporary Restraining Order Should be Entered *Ex Parte*

Plaintiffs request that the proposed temporary restraining order be entered *ex parte*.

Congress has looked favorably on the availability of *ex parte* relief under the second proviso

of Section 13(b) of the FTC Act: "Section 13 of the FTC Act  authorizes the Commission to

---

[129] Plaintiffs recommend that the Court appoint Bob Morrison or Mark Bernet, who are recommended in Plaintiffs' Application for Temporary Receiver.

[130] *R. J. Allen & Assoc.*, 386 F. Supp. at 878 (in such circumstances "the appointment of a receiver is necessary '[t]o prevent diversion or waste of assets to the detriment for those for whose benefit, in some measure, the injunction action is brought' . . .."); *see also FTC v. Wolf*, No. 94-8119, 1996 U.S. Dist. LEXIS 1760 (S.D. Fla. Jan. 30, 1996); *SlimAmerica*, 77 F. Supp. at 1276-1277.

file suit to enjoin any violation of the FTC [Act].  The Commission can go to court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress."[131]

Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given.  Proper circumstances for *ex parte* relief include situations where notice would "render fruitless further prosecution of the action."[132]

As set forth in detail in the Rule 65(b) Declaration of Counsel accompanying Plaintiffs' Motion, notice to Defendants would cause irreparable injury by giving Defendants time to destroy records and conceal assets.  Only through such an *ex parte* temporary restraining order can the Court prevent the otherwise likely destruction of documents and secretion of assets – both of which would jeopardize the possibility of final effective relief for victims.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiffs' *Ex Parte* Motion For a Temporary Restraining Order with an Asset Freeze, the Appointment of a Receiver and other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

Respectfully submitted,

**DAVID C. SHONKA**
Acting General Counsel

---

[131] S. Rep. No. 103-130 at 15-16 (1994).
[132] *In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir.  1979); *AT&T Broadband v. Tech Commc'ns., Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004).

Dated:  November 5, 2012

BARBARA E. BOLTON, Trial Counsel
ROBIN L. ROCK
RYAN T. HOLTE

225 Peachtree Street, N.E., Suite 1500
Atlanta, Georgia 30303
(404) 656-1362 (Bolton)
(404) 656-1360 (Holte)
(404) 656-1379 (Facsimile)
Email: bbolton@ftc.gov
Email: rholte@ftc.gov
Email: BCPBriefBank@ftc.gov
Email: ecfatlanta@ftc.gov

Attorneys for Plaintiff
**FEDERAL TRADE COMMISSION**

27